
07/12/2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| EDWARD MANDEL, | § | Case No. 10-40219 |
| | § | |
| Debtor. | § | |
| _____ | § | |
| C. MICHAEL JONES, | | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 10-4099 |
| | § | |
| EDWARD MANDEL and | § | |
| IRENE MANDEL, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On April 28 and 29, 2011, the Court tried the claims asserted by C. Michael Jones ("Jones") against Edward and Irene Mandel (collectively, the "Mandels") and the Mandels' counterclaims. The Court has jurisdiction over the parties and the issues in this adversary proceeding in accordance with 28 U.S.C. §§ 1334 and 157(b). The Court adopts the statement of stipulated facts set forth in the parties' pretrial order, which the Court entered on April 28, 2011. In addition, having determined the credibility of the witnesses and considered all other evidence presented, the Court makes the following findings of fact and conclusions of law.

**I.    FINDINGS OF FACT**

    **A.    Wilson Introduces Jones to the Mandels**

1.    Jones owned and operated JRJ Development Company International at all relevant times.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW– PAGE 1**

2. Jones has a degree in architecture from Texas A&M University. He has been designing and building residential homes for 35 years. In addition, Jones has provided design services for another home builder named Gary Wilson ("Wilson") for many years.

3. Wilson introduced the Mandels to Jones after the Mandels expressed an interest in building homes for sale.

4. Jones' testimony that he did not hold himself out to the Mandels as an architect, registered or otherwise, was credible. The Mandels, however, may have understood him to be a registered architect based on their conversations with Wilson.

5. Jones is not, and never has been, a registered architect in any jurisdiction.

**B.   Jones Designs the Mandels' Personal Residences**

6. Jones orally agreed to provide design services to the Mandels for their personal residence on Lorraine Drive in Frisco, Texas. Jones negotiated a fee with the Mandels based on the square footage of the home.

7. Wilson contacted Jones about providing designs for a house to be built on Normandy Drive in Frisco. Wilson represented that the Mandels were investors with respect to the Normandy home and would be paying for Jones' services. Jones orally agreed to provide design services for a fee based on the square footage of the home.

8. Wilson built the house on Normandy. Afterwards, the Mandels moved from Lorraine and made the house on Normandy their personal residence.

**C.   Jones Designs Three Additional Homes for the Mandels**

9. The Mandels paid Jones for his work on the Normandy and Lorraine properties. This adversary proceeding relates to unpaid fees and expenses for the design

work Jones performed for the Mandels in connection with three additional properties in Plano and Frisco, Texas. Jones designed single-family dwellings for each of the three properties. As the parties did at trial, the Court will refer to the three properties as the Stone Canyon, Longvue, and Old Gate properties.

10. With respect to Stone Canyon, Gary Wilson originally intended to build his own home on the property. Jones orally agreed to develop plans for the residence. Wilson approved the plans and was arranging financing for the construction of the home when he became seriously ill.

11. The Mandels bought the Stone Canyon lot from Wilson.[1] Jones subsequently met with the Mandels, showed them the design and construction drawings he had developed for Wilson, and asked the Mandels if they would like to purchase the plans. The Mandels agreed to purchase the plans if Jones made significant revisions. Jones orally agreed to provide modified plans to the Mandels for $1.50 per square foot plus costs. Jones met with the Mandels three or four times, and, at their request, re-designed the home from a contemporary style to a Mediterranean style.

12. After completing the plans for the Stone Canyon property, Jones incurred out-of-pocket expenses by obtaining a CAD (Computer Aided Design or Computer Aided Drafting) drawing.

13. Jones met with the Mandels to review the CAD drawings. The Mandels approved the drawings and began construction. They also requested that Jones provide a

---

[1] Gary Wilson was in and out of a coma—in a semi-lucid state—when the sale took place. His daughter, Ashley Wilson, sold the lot to the Mandels pursuant to a power of attorney signed by her father. The transaction was handled by Catherine Fizell, who at that time worked for Wilson as an independent contractor.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW– PAGE 3**

rendering to help them market the home for sale. Jones agreed, and he paid a third party to prepare a rendering for the Mandels.

14. With respect to the Longvue property, the Mandels owned the lot and were marketing it for sale while Jones was working on the plans for the Stone Canyon property. The Mandels asked Jones to discuss design concepts with a prospective purchaser of the Longvue property. The sale never happened, but the Mandels liked Jones' concept and decided to build a home on speculation. They asked Jones to prepare design plans for the Longvue property. Jones orally agreed to design a home for the property for $1.50 per square foot plus costs.

15. Jones met with the Mandels several times to discuss design plans for the Longvue property. Jones developed the plans and incurred out-of-pocket costs to obtain a CAD drawing. After Jones obtained the CAD drawing, the Mandels requested more changes, and Jones incurred additional out-of-pocket costs to obtain a revised CAD drawing. Jones delivered the final CAD drawing to the Mandels at their house on Normandy.

16. Jones agreed to design a third home for the Mandels for the Old Gate lot in Plano for $1.50 per square foot plus costs. Jones completed the design and delivered the plans to the Mandels at their home. Similar to the Longvue property, however, no home was ever built on the Old Gate property.

17. Jones was entitled to be paid upon completion of his work. As a courtesy to builders such as Wilson, Jones sometimes allowed his clients to delay payment until they obtained construction funding.

18. On April 6, 2006, Jones sent the Mandels a hand-written letter demanding payment of the amounts owed. The Mandels received the letter.

19. While Edward Mandel's recollection of the parties' dealings contradicted that of Jones, the Court, having observed the demeanor of the witnesses and the documentary evidence, finds that the Mandels did not purchase plans for the Stone Canyon property with the lot. Jones designed plans for the Stone Canyon property for the Mandels after their purchase of the property. Jones also created new designs for the Longvue and Old Gate properties for the Mandels.

20. Jones' oral agreements to provide design plans to the Mandels for the Stone Canyon, Longvue, and Old Gate properties could be, were contemplated to be, and in fact were, performed within a year.

21. The Mandels have not paid Jones his fees or costs for his work on the Stone Canyon, Longvue, and Old Gate properties. Jones incurred and paid costs of $7,632.90 in connection with the preparation of the Old Gate plans, costs of $3,997.40 in connection with the preparation of the Stone Canyon plans, and costs of $3,049.20 in connection with the preparation of the Longvue plans

22. The Mandels breached their contract by failing to pay Jones for his work. Jones has suffered actual damages in the total amount of $42,123.25 as a direct and proximate result of the Mandels' breach of contract.

### D. The Mandels' Counterclaim for Restitution

23. The Mandels assert a counterclaim for restitution. In their counterclaim, the Mandels assert that they paid for an exclusive, copyrighted set of plans with respect to the Normandy property. The Mandels further assert that Jones improperly used the plans

for the Normandy property to build another, virtually identical home on Castle Bank Lane in Frisco, Texas. They seek restitution of the amounts they paid to Jones relating to his designs for the Normandy property.

24. In light of the recent opinion by the Supreme Court in *Stern v. Marshall,* – S.Ct. –, 2011 WL 2472792 (2011), the Court does not have the constitutional authority to decide this counterclaim – at least not in the absence of the parties' express consent.

### E. Edward Mandel Files for Bankruptcy

25. Jones sued the Mandels in Texas state court on November 27, 2007. The state court scheduled a jury trial for February 1, 2010.

26. Edward Mandel filed a petition for relief under chapter 11 of the Bankruptcy Code on January 25, 2010. He subsequently removed the state court action to this Court.

27. Jones timely filed proof of his claim in Edward Mandel's bankruptcy case. Edward Mandel objects to the allowance of his claim and argues that the claim is void under Texas law. Jones' claim and Edward Mandel's objection are co-extensive with this adversary proceeding.

## II. CONCLUSIONS OF LAW

### A. Breach of Contract

1. Under Texas law, the elements of a cause of action for breach of contract are: (a) the existence of a valid, enforceable contract; (b) plaintiff has standing to sue for breach of the contract; (c) plaintiff performed, tendered performance or was excused from performing its contractual obligations; (d) defendant breached the contract; and (e)

defendant's breach caused plaintiff's injury. *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App – Houston [14th Dist.] 2005, no pet).

2. Here, the Mandels engaged Jones to design plans for them and agreed to pay Jones for his work. Jones did not perform the work as a favor to the Mandels and Jones did not agree that he would not be paid for his work unless the Mandels sold the properties.

3. Jones designed residential homes for the Longvue, Old Gate, and Stone Canyon properties for the Mandels. Jones provided the Mandels with the designs pursuant to their agreement. The Mandels were obligated to pay Jones $1.50 per square foot upon the completion of his work. The Mandels, however, have not paid Jones for his work on the Stone Canyon, Longvue, and Old Gate properties.

4. Jones' actual contractual damages are $42,123.25.

5. Jones' argument that the Mandels never intended to pay him for his work was not supported by the preponderance of the evidence at trial. Likewise, Jones' argument that the Mandels fraudulently induced him to enter into an agreement to provide them with design plans was not supported by the preponderance of the evidence at trial. At some point, however, the Mandels decided that they would rather spend years in litigation than pay Jones.

### B. Affirmative Defenses

6. The Mandels assert that Jones breached the contracts first and that his oral agreements to provide them with designs for their properties are barred by the statute of frauds. These affirmative defenses are without merit. The oral agreements for design

services could be performed within a year of the agreement, and Jones did not breach the agreements.

7.  The Mandels also object to the allowance of Jones' claim on the grounds that under the Texas Declaratory Judgment Act, their oral agreements with Jones are void under Texas law. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011. In particular, the Mandels argue the Architects Registration Law prohibits Jones from engaging in the practice of architecture without first registering with the Texas Board of Architectural Examiners. *See* TEX. OCC. CODE § 1051.001 *et seq.* Since Jones is not registered as an architect, the Mandels assert that their oral agreements with Jones are void.

8.  The Texas Board of Architectural Examiners administers the Architects Registration Law. *See* TEX. ADMIN. CODE tit. 22, § 1.1. The Architects Registration Law generally requires that "[a]n architectural plan or specification for the construction, enlargement, or alteration of a privately owned building shall be prepared by an Architect or under the Supervision and Control of an Architect *unless a Nonregistrant may prepare the plan or specification pursuant to an exemption described in Chapter 1051 of the Texas Occupations Code*." TEX. ADMIN. CODE tit. 22, § 1.211(a) (emphasis added).

9.  Jones does not dispute that he is a nonregistrant. He argues that he falls within an exemption to the registration requirement -- § 1051.606(a)(4). There are two elements to the applicable exemption. The Architects Registration Law provides that the registration requirement does not apply to a person who (1) does not represent that he is a registered architect or architectural designer and (2) who "prepares the architectural plans and specifications for or observes or supervises the construction, enlargement, or alteration of a privately owned building that is … a single-family or dual-family dwelling

**FINDINGS OF FACT AND CONCLUSIONS OF LAW– PAGE 8**

or a building or appurtenance associated with the dwelling …." TEX. OCC. CODE § 1051.606(a)(4)(B). *See* TEX. OCC. CODE § 1051.001(1) (defining the term "architect" to mean "a person registered under this chapter to engage in the practice of architecture."). *See also* TEX. ADMIN. CODE 22, § 1.1(6) (defining an "architect" as "[a]n individual who holds a valid Texas architectural registration certificate granted by the Board).

10. The parties dispute the first element, that is, whether Jones represented himself as an architect.

11. The Architects Registration Law prohibits nonregistrants from marketing their services by using the words "architect" or "architecture." Only "[a]rchitects duly registered in Texas are authorized to use any form of the word "architect" or the word "architecture" to describe themselves and to describe services they offer and perform in Texas." TEX. ADMIN. CODE tit. 22, § 1.123(a). No entity other than registered architects or businesses employing registered architects "may use any form of the word 'architect' or 'architecture' in its name or to describe services it offers or performs in Texas." *Id.* at § 1.123(c).

12. Registered architects may also be distinguished from nonregistrants through the use of an architect's seal containing their registration number. *See* TEX. ADMIN. CODE tit. 22, § 1.103 (providing the required design of the architect's seal). A registered architect generally must seal, sign and date architectural plans and designs when they are issued. *See* TEX. ADMIN. CODE tit. 22, § 1.101.

13. Although the Texas legislature enacted the Architects Registration Law in 1937, there is little relevant case law.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW– PAGE 9**

14. In *Clark v. Eads*, 165 S.W.2d 1019, 1023 (Tex. App. – Ft. Worth, 1942, ref., w.m.), the court interpreted the predecessor exemption statute, which was substantially identical to § 1051.606(a) of the Texas Occupation Code. The court explained that "the statute is patently designed to permit ordinary carpenters and contractors, and other persons who make no pretense of being architects, to draw house plans and to build or supervise the building of structures. It was not intended to permit architects who generally hold themselves out as such to practice their profession without a license simply by resorting to the expedient of explaining to their clients that they had no license."

15. The facts of *Clark v. Eads* are distinguishable from the present case. Eads sued to recover for services he provided to the Clarks in the preparation of plans for a proposed residence. In contrast to Jones, however, Eads admitted that he held himself out as an architect. He alleged in his complaint that he was consulted as an architect and rendered services as an architect, and he testified at trial that he was an architect. No one but an architect could have done the work he did for the Clarks.

16. In this case, Jones did not use the words "architect" or "architecture" in the name of his business. He has been careful to describe his business as providing design services rather than architectural services. He does have a degree in architecture, but the Architects Registration Law does not require the registration of everyone with an architectural degree, nor does it prohibit a nonregistrant from disclosing that he holds a degree in architecture.

17. Jones did not generally hold himself out to the public as an architect, nor did he represent to the Mandels that he was an architect or that he was providing them with architectural services.

18. The Court, for all the foregoing reasons, concludes that the Mandels have failed to establish grounds for a declaration that their oral agreements with Jones are void under the Texas Declaratory Judgments Act.

### C. Attorney's Fees

19. Trial courts have the authority to award attorney's fees in declaratory judgment actions. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (courts may award costs and reasonable and necessary attorney's fees as are equitable and just).

20. The decision to award attorneys' fees is based on four factors: the fees awarded must be reasonable and necessary, which are matters of fact, and they must be equitable and just, which are matters of law. TEX. CIV. PRAC. & REM. CODE § 37.009; *see Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex. 1998). The trial court is not required to award attorneys' fees to the prevailing party. *Moosavideen v. Garrett,* 300 S.W.3d 791, 802 (Tex. App. -- Houston [1st Dist] 2008, pet. denied). In exercising its discretion, the trial court may decline to award attorneys' fees to either party. *See Univ. of Tex. Health Sci. Ctr. v. Mata & Bordini, Inc.,* 2 S.W.3d 312, 319 (Tex. App. -- San Antonio 1999, pet. denied); *United Interests, Inc. v. Brewington, Inc.,* 729 S.W.2d 897, 906 (Tex. App. -- Houston [14th Dist.] 1987, writ ref'd n.r.e.).

21. Here, Jones has prevailed in the declaratory judgment action brought by the Mandels. As the prevailing party, Jones requests an award of $35,000 in attorneys'

**FINDINGS OF FACT AND CONCLUSIONS OF LAW– PAGE 11**

fees, consisting of 140 hours at the hourly rate of $250.[2] The Court finds that an award of $20,000 is just, equitable and reasonable under the circumstances of this case.

22. To the extent any finding of fact is construed to be a conclusion of law, the Court hereby adopts it as such. Likewise, to the extent and conclusion of law is construed to be a finding of fact, the Court hereby adopts it as such.

23. The Court will enter a separate judgment liquidating Jones' claim against Edward Mandel and overruling Edward Mandel's objection to Jones' claim consistent with these findings and conclusions.

Signed on 7/12/2011

*Brenda T. Rhoades*   MD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[2] According to their application for employment filed on April 30, 2010, in the main bankruptcy case, the hourly rates charged by counsel for the Mandels ranges from $225 for associates to $450 for the lead partner handling this adversary proceeding.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW– PAGE 12**